JOHN MILLER, as Administrator, etc., of WILLARD MILLER, Deceased, Respondent, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Appellant.

*Negligence of a railroad company — contributory negligence of a traveler on a highway — inferences from facts to be drawn by the jury.*

The negligence of a railroad company does not excuse a traveler on a highway from exercising care on his part, in looking and listening before crossing the railroad tracks of such company in order to escape the danger of moving trains.

When, upon the trial of an action brought to recover damages resulting from the death of the plaintiff's intestate, by reason of the alleged negligence of the defendant, there is a conflict in the evidence in respect to some of the important circumstances relating to the conduct of the deceased on the occasion of the injury, if the solution of such conflict of evidence is within the province of the jury, the jury must also determine what inference should be drawn from the facts which it may find to have been established under the circumstances disclosed by the evidence relating to the question of the intestate's freedom from contributory negligence.

APPEAL by the defendant, The New York Central and Hudson River Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Herkimer on the 12th day of December, 1893, upon the verdict of a jury rendered after a trial at the Herkimer Circuit, and also from an order entered in said clerk's office on the 9th day of December, 1893, denying the defendant's motion for a new trial made upon the minutes, with notice of an intention to bring up for review on such appeal said order.

*C. D. Prescott*, for the appellant.

*Myron G. Bronner*, for the respondent.

HARDIN, P. J. :

Plaintiff's intestate was a young man about eighteen years of age. In the early part of the day of February 1, 1892, he left his home in Jacksonburg, a hamlet three miles west of Little Falls on the south side of the river, and upon reaching Little Falls mingled with the crowd watching the ruins of a large fire that occurred on the morning of that day in Main street, and during the day was accompanied with a brother-in-law, House, visiting various parts of the village until about half-past seven, when, together, they took a horse and cutter from the Girvan House and drove to the corner of Main and Second streets to obtain some confectionery, and from there they passed westerly along Main street until they reached Lock street, which is the most westerly street in the village of Little Falls leading to bridges across the Mohawk river. They turned to the left from Main street into Lock street, which passes nearly north and south, and crosses the tracks of the defendant at right angles. Lock street is about ninety feet in length from the southerly side of Main street to the north side of the tracks of the defendant. On the westerly side of Lock street are several buildings, one, a barn, fronting on Lock street, the main portion of which is thirty-six feet, and there is an addition to that barn that is about twelve feet in width on Lock street, and a distance of some eleven feet south of the addition to the barn is a building known as the "Cold Storage Building" or "Armour Building," and south of that is a platform connected by a spur or stub connecting with the main tracks of the defendant, used for the purpose of moving freight cars in front of the storage building. In front of the storage building, facing the defendant's track, is a platform of about three feet in width, which is about three feet high above the level of the street. The length of the cold storage building is about sixty feet along the railroad. West of the cold storage are some other buildings. On the opposite or easterly side of Lock street are several buildings, and after passing over defendant's tracks along Lock street there is a dyke and buildings to the east of the street, and still further south is the first span of the bridge across to the Hansen island, and from that island

to the southerly shore of the river another bridge. These bridges were built and put in use about the year 1892, and during the year when the bridge at the foot of Ann street, or including a portion of Bridge street, was destroyed. The people residing south of the river and in the westerly portion of the village were accustomed to use Hansen bridges and Lock street as a means of ingress to and egress from the village. The decedent had frequently passed over the Hansen bridges and along Lock street in visiting and returning from the village. The deceased was driving the horse and seated on the right hand side of the cutter, and his companion, House, on the left hand side on the seat, and as they neared the tracks of the defendant a freight train on track No. 4 (which is the northerly track) was passing eastwardly, and by reason of that, when they were a few feet from the spur, they halted the horse and waited till the passage of the train east, and when the rear car thereof had passed some 300 feet eastwardly the horse was started up, and, according to one of the witnesses, on a shack, and, according to one of the witnesses, on a walk. A train known as No. 42, or Syracuse and Albany accommodation, passing eastwardly on track No. 1 at a rate of twenty or twenty-five miles an hour, came in collision with the horse and cutter, causing the death of the plaintiff's intestate. House was found some twenty or twenty-five feet east of the crossing between tracks 1 and 2. The body of the horse was fifteen or twenty feet further east between the same tracks, and the deceased was twenty feet still further east between tracks 1 and 2. The witnesses say: "It was a snowy night; not very dark nor very light." The train was due at Little Falls at seven-fifty-three, and being a few minutes behind time, reached there at seven-fifty-five. The witness House testified that when opposite the northeast corner of the storage building in the traveled part of the street, in the middle of the street, they stopped, having driven up to the crossing; the freight train was going east, and the deceased waited until the train had got by and looked that way, that is, east, and the witness adds, "I looked east — turned and looked east — and the train had got down by so that they were about in a line with the dike works. I turned around like that (indicating), and Miller sat in the cutter, and when I looked around like that (indicating) he spoke to the horse, and she started on a shack. I kind of turned

my head east, and he drove on the track, and when I turned around to look west the cars were right on us.   When I turned around and looked west he was in the act of like this (indicating).   That is all I remember.   Q. Of pulling back on the reins?   A.  Yes, sir; while we were waiting, at least, I listened.   When the horse was standing there, as the train was going east, he sat with his lines in both hands, and when the train had got down, and I looked east and turned around he sat like that, leaning forward (illustrating), something similar to that.   Q. That is, he sat with a rein in each hand?   A. Yes, sir; a rein in each hand, leaning kind of forward, as I looked around like that (illustrating), and Miller spoke to the horse to go on."   The witness adds that the deceased was reining in the horse at the time the train struck them, and that at the time he saw Miller pulling back he saw the train on No. 1 track; " it seemed when I looked around that it was coming right on to me.   Perhaps a second's or something like that warning.   Just as I looked around I saw it coming.   It was snowing a little.   A very dull heavy night; cloudy somewhat."   There is considerable conflicting evidence as to some of the essential facts and circumstances relating to the question of the defendant's negligence, and the question of the freedom of the plaintiff's intestate from negligence on the occasion of the accident.

(1) Several witnesses say that prior to the collision they observed the train approaching from the west which caused the injuries, and that the whistle was not blown nor the bell rung.   One witness, who observed the train when it was within 100 feet of the crossing, testified positively that no whistle was sounded or bell rung.   The witness House says he did not hear any bell; that he was listening and that the whistle did not blow.   The witness Eysaman testified that he resided some 400 or 500 feet west of the Lock street crossing, and that when the Little Falls accommodation was passing that night " I (he) stood out of doors on the west side of my yard.   I noticed that train pass by my place; the bell was not ringing; the whistle was not blowing."   And in the course of his cross-examination he said : " The location where I claim to have noticed in regard to the bell or whistle was between four or five hundred feet west of the Lock street crossing.   I noticed the train, and I am confident that it was not ringing."   The witness Prall testified that he lived

in the first house west of the Lock street crossing, and that he noticed the train coming in that evening; that his windows were open south towards the railroad, and that he was about to shut his blinds when the train went by; and he adds: "The whistle of the train was not blowing; the bell was not ringing."

On the other hand, the defendant called several witnesses who testified that the station signal was given; that the whistle was blown and that the bell was rung before reaching, and at the time of reaching, the crossing. In the course of the charge delivered by the learned trial judge he called attention to the conflict in the evidence in respect to the management of the train and to the different statements made by the witnesses as to whether the bell was rung or whistle sounded, and fairly and squarely submitted to the jury the question in respect to whether the defendant, under the circumstances disclosed by the evidence, was guilty of negligence which produced the collision. We think the evidence required the judge to submit the question as to the defendant's negligence to the jury, and that their verdict in that regard is controlling here. (*Massoth* v. *D. & H. C. Co.*, 64 N. Y. 534; *Beckwith* v. *N. Y. C. & H. R. R. R. Co.*, 54 Hun, 446; S. C. affd., 125 N. Y. 759.)

(2) The learned counsel for the appellant raises a close and critical question as to whether, under the evidence given, the plaintiff's intestate was shown to be free from contributory negligence, and whether the facts and circumstances were such as to warrant the inference on the part of the jury that he had exercised that care and caution which the law exacts from a party who is about to pass over the tracks of a steam railroad. Undoubtedly the negligence of the defendant "does not excuse a traveler on the highway from exercising care on his part in looking and listening before crossing the railroad tracks in order to escape the danger of moving trains." (*Cullen* v. *D. & H. C. Co.*, 113 N. Y. 667.) In that case the evidence warranted a strong inference that the party neither looked nor listened, and there was no reasonable ground for the supposition that he was in a position where he had to choose between two imminent perils, and that he could not have escaped one without encountering the other. Here there is a conflict as to some of the material facts relating to the question of the deceased's freedom from negligence. It is insisted, and proof is given tending to support the contention,

that no car stood on the spur in front of the cold storage building on the occasion of the accident.   Considerable evidence is given by the defendant to support that contention.   On the other hand, there is evidence to the effect that there was a car standing on the spur in front of the cold storage building, and that it projected beyond the east end of the building.   House testifies: "It stood out in Lock street considerably; it projected beyond the east end of the cold storage building; it was a box car."   And the same witness, in the course of his cross-examination, says: "I am quite certain there was a refrigerator car on that spur; I saw it myself."

The witness Anderson, who assisted in carrying the body of Miller into a house, says: "Right after we carried in Miller and House I came back here and noticed whether there was a car standing upon this spur.   I saw a car standing upon this spur or branch.   By the Court.— That car stood with the eastern end of it about even off with the platform of the refrigerator building.   The end of the car which was next to the street was even with the platform of the house.   A. I claim to have seen this car about fifteen minutes after the accident;" and when he was pressed upon the subject of what called his attention to the car, he said: "It obstructed the view of the railroad off to the west," and that he was looking to see; and he adds: "I am willing to swear positively that there was a car that night at that time."   Upon this conflict it was for the jury to determine whether the car stood in front of the cold storage building and furnished an obstruction to the observation of a train approaching from the west.   And upon the question we are now considering it must be assumed that the jury found, upon the conflict, favorable to the plaintiff.   Green, a surveyor, was called, who had made measurements in Lock street as to how far one could see west on track No. 1 standing in Lock street, and he says, viz.: "Standing at a point 12 feet north from the north rail of track No. 4, in the center of Lock street, I could see an object in the center between the rails on track No. 1 at a point 30 feet westerly of the center of Lock street, measured between the rails of track No. 1.   I could not see farther by reason of a car on the branch, which stood out, I should think, between 2 and 3 feet east of the line of the cold storage building.   I did not

make any measurements of it.   Changing my position to a point 10
feet north of the railroad track No. 4, going 2 feet near to No. 4, I
could see an object 108 feet between the rails of track No. 1, from
the center of Lock street.   The point of 10 feet came just inside of
that stub.   Ten feet from the north rail of track No. 4 brought me
just south of the north rail of the stub, and the point of 12 feet
brought me just north of the north rail of the stub."   And in the
course of his cross-examination he says that he passed down on to
the stub track two feet, which just stepped him over the north rail,
and that he then took another observation by the corner of that car,
and then he could see 108 feet from the center of Lock street on
track No. 1; "if I had stepped one foot farther south on Lock
street looking then by the corner of that car, I would have seen, I
should think, 250 feet, perhaps more,   *   *   *   and if I had
stepped one foot further than that, that is, two feet, then I could
see 1,000 feet up on track No. 1 or more possibly.   And then
that would have brought me about on the south rail of the stub
track very nearly.   From the south rail of the stub track it is possi-
ble that I could see 1,000 feet or more to the west.   I can't say for
certain."   This witness also testified that "assuming that this car
had stood so that its east end was on the line of Lock street, I
would have seen a great deal farther west than I did with it stand-
ing where it did, over on the street."   This same witness testified as
to the length of a horse and cutter measured from the nose of the
horse to the rear of the cutter, and he stated it to be thirteen feet
and eight inches, and that if a person sat in the cutter his eyes would
be six or eight inches nearer the horse than the back end of the cut-
ter, and that would vary somewhat, depending upon whether the
person held his head forward or back; that variation might make
it a foot.   Inasmuch as there was a conflict in the evidence in
respect to some of the important circumstances relating to the
conduct of the deceased on the occasion of the injury, and
inasmuch as a solution of that conflict was within the province of
the jury, so too, we think, it was for the jury to determine what
inference should be drawn from the facts which they found estab-
lished under the circumstances disclosed by the evidence relating to
the question of the intestate's freedom from contributory negli-
gence.   (*Chisholm* v. *State*, 141 N. Y. 246; *Gilbert* v. *L. I. R. R.*

*Co.,* 80 Hun, 366.) House, in detailing the circumstances, states that they stopped and waited until the freight train had gone by, and that they were then near the north freight track and about even with the cold storage building; he adds: "We were opposite the northeast corner in traveled part of the street — in the middle of the street. As I say, we stopped. Miller was still driving. We drove up to the crossing. The train was going east. He waited until the train had got by, and looked that way (indicating). Q. Looked which way? A. East. We looked east. I looked east — turned and looked east, and the train had got down by so that they were about in a line with the dike works. I turned around like that (indicating), and Miller sat in the cutter, and when I looked around like that (indicating) he spoke to the horse and she started on a shack. I kind of turned my head east, and he drove on the track, and when I turned around to look west the cars were right on us. When I turned around and looked west he was in the act of — like this (indicating), that is all I remember. Q. Of pulling back on the reins? A. Yes, sir. * * * I looked east when we got out on the track, and I turned around to look west, and he was like that (illustrating), reining in the horse." The witness continues that Miller was sitting back drawing in the reins as the train approached. The learned judge called the jury's attention to the rule in respect to the conduct of a party when an emergency is suddenly upon him, and in connection with that rule submitted the whole question of fact as to whether the deceased was free from contributory negligence to the jury in cautious language, leaving the jury to deal with the facts and circumstances and inferences to be deduced from the whole body of the evidence.    Under the rules that have been laid down in numerous cases, we are of the opinion that no error was committed in that regard. (*Beckwith* v. *N. Y. C. & H. R. R. R. Co., supra; Towns* v. *R., W. & O. R. R. Co.,* 28 N. Y. St. Repr. 124, and cases cited in the opinion; *Pitts* v. *N. Y., L. E. & W. R. R. Co.,* 29 N. Y. Supp. 871.)

This case differs from *Stopp* v. *Fitchburg R. Co.* (29 N. Y. Supp. 1008) as in that case it appeared that a party approaching the crossing fifty feet from the track could have seen a locomotive 1,000 feet if she had looked, and upon all the facts and circumstances disclosed in that case the judge who delivered the opinion was constrained to say: "That she did not look, excepting straight in front of her, but went

heedlessly on. If she had looked, she would have seen the locomotive, and have had ample time to stop and be safe. If she did not do so, it was negligence; if she did not look, it was negligence." In the case in hand there is no absolutely definite evidence as to the speed of the train, nor is there absolutely definite evidence as to the rate of speed of the deceased's horse when it was started up after having waited for the passing of the freight train; and, considering the other uncertain events and circumstances surrounding the deceased on the occasion of the injury, we are of the opinion that the rule laid down and stated in *Pitts* v. *N. Y., L. E. & W. R. R. Co.* (*supra*), and the authorities there referred to, warranted the trial judge in refusing to grant a nonsuit on either of the grounds mentioned by the learned counsel for the appellant and in submitting the questions of fact involved in the case to the jury.

(3) Upon a careful review of the evidence brought to the attention of the court by the motion for a new trial on the minutes on the alleged ground that the verdict is against the weight of evidence, and applying the rule laid down in *Kaare* v. *T. S. & I. Co.* (139 N. Y. 369), we think a new trial should not be granted on the ground that the verdict is against the weight of evidence. (See *Beckwith* v. *Central Road, supra; Pitts* v. *N. Y., L. E. & W. R. R. Co., supra*.)

(4) When the trial judge was asked to instruct the jury " that the fact that the deceased passed upon a shack or trot upon the tracks is some evidence of want of care and prudence " the court responded thereto, viz.: " I leave that for the jury. I don't think that is for the court." As already indicated, there was some evidence relating to the movements of the horse beside that given by the witness House, and it was for the jury to determine what was the essential fact, at what particular speed the horse was moving, and what particular points the witnesses referred to, and we think it was not error in the court to submit the whole question of " care and prudence," under the circumstances disclosed, to the jury, and that the exception taken to that request is unavailing.

The verdict rendered by the jury was for $1,375. No criticism is made by the defendant as to the amount thereof.

The judgment and order should be affirmed, with costs.

Martin and Merwin, JJ., concurred.

Judgment and order affirmed, with costs.